## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN

ISOKE ROBINSON,

    Plaintiff,

    v.

DION CORBIN, PATRICK MIFSUD, SEAMUS WADERLOW, KYLE ARELLA, in their individual capacities, and THE CITY OF DETROIT,

    Defendants.

No. 4:23-cv-12676

Hon. F. Kay Behm

Mag. Anthony P. Patti

_____/

## PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Isoke Robinson, by and through her counsel, Oliver Bell Group, and for her First Amended Complaint and Jury Demand alleges the following:

## INTRODUCTION

1. "Number nine do another half investigation?" Defendant Seamus Waderlow.[1]

2. "Yeah, it tends to happen." Defendant Kyle Arella.

## JURISDICTION AND VENUE

---

[1] Presumably referencing Detroit's Ninth Precinct which was responsible for the investigation.

3. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because they arise under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all the events giving rise to this Complaint occurred within the Eastern District of Michigan.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same set of facts and are part of the same case and controversy.

## PARTIES

6. Plaintiff Isoke Robinson is a Michigan resident who was living in Detroit at the time of the events alleged in this complaint.

7. Defendant Dion Corbin is a detective employed by Defendant City of Detroit.

8. Defendant Patrick Mifsud is a police sergeant employed by Defendant City of Detroit.

9. Defendant Seamus Waderlow was a police officer employed by Defendant City of Detroit at all times relevant to the allegations in this Complaint.

10. Defendant Kyle Arella was a police officer employed by Defendant City of Detroit at all times relevant to the allegations in this Complaint.

11. Defendant City of Detroit is a municipality within the State of Michigan.

## FACTUAL ALLEGATIONS

12. At all times relevant to the allegations in this Complaint, Ms. Robinson was the owner of a white 2013 Dodge Charger.

13. On September 3, 2023, an individual committed drive-by-shooting in a white Dodge Charger at Evanston and Chalmers in Detroit.

14. The shooting occurred just off of I-94.

15. During the initial investigation, witnesses identified the vehicle used in the shooting as a white Dodge Charger.

16. The witnesses also gave descriptions for the shooter and occupants of the car.

17. None of the descriptions matched Ms. Robinson.

18. DPD employees used footage from "Green Light District" cameras to identify that the vehicle involved in the shooting was a white Dodge Charger.

19. The videos also showed that the vehicle had tinted windows, a spoiler, and an inoperable left fog light.

20. None of the videos contained a legible license plate number.

21. Thus, DPD employees turned to the FLOCK system – a network of approximately 83 license plate readers[2] ("LPR") at various intersections throughout Detroit.

---

[2] Andrea May Sahouri, *Detroit to Spend $5M in Federal Funds on 100 License Plate Readers at 25 Intersections*, DET. FREE PRESS (Sept. 26, 2023) *available at*

22. One of those LPRs was located at the intersection of Morang and Kelly, approximately two miles from the shooting and .3 miles from the home where Ms. Robinson lived.

23. Ms. Robinson's vehicle was allegedly[3] photographed going through the intersection near her home approximately 15 minutes before the shooting.

24. According to the Michigan Secretary of State, there are currently 241 2013–2016 Dodge Chargers *registered* to addresses in the following zip codes, 48205, 48201, 48211, 48212, 48213, 48214, 48215, 48225, 48230, 48234, and 48236.

25. The image below highlights the zip codes referenced above. There is a red X in the approximate location of the shooting. The approximate location of the LPR is marked with an orange X.

---

https://www.freep.com/story/news/local/michigan/detroit/2023/09/26/detroit-oks-5-million-expansion-of-license-plate-reader-technology/70972984007/.

[3] It appears Defendants failed to preserve this data.



26. Upon information and belief, residents in some, or all of these zip codes, routinely register their vehicles at other addresses to avoid the high insurance deductibles associated with Detroit.

27. Upon information and belief, a vehicle could get to and from the scene of the shooting to I-94 without passing a license plate reader.

28. According to Defendant Corbin, the FLOCK system deletes data after 90 days and he chose not to save the data alleged to show Ms. Robinson's car travelling through that intersection at that time.

5

29. Defendant Mifsud told Defendant Corbin that Ms. Robinson's vehicle was the one used in the shooting because it had been seen on a license plate reader at Morang and Kelly in Detroit.

30. The license plate reader was approximately two miles away from the scene of the shooting and less than half a mile from Ms. Robinson's home.

31. Defendant Corbin reviewed the FLOCK information, Project Green Light camera footage, and witness interviews and independently determined that the Ms. Robinson's vehicle was the one used in the shooting.

32. Defendant Corbin reached this conclusion despite knowing:

   a. The LPR that identified Ms. Robinson's vehicle being nearly two miles from the scene of the crime;

   b. There are a large number of white Dodge Chargers in Detroit; and

   c. The vehicle used in the shooting was lost by both the FLOCK system and Project Greenlight after the shooting, indicating significant gaps in the coverage.

33. Defendant Corbin further failed to determine if there were any LPRs between the scene of the shooting and the LPR at Morang and Kelly that identified Ms. Robinson's car.

34. A squad car was dispatched to drive by Ms. Robinson's house on the night of September 3, 2023, and did not see her car.

35. Defendant Corbin assumed this meant that Ms. Robinson's car was not at her home, despite the presence of a vehicle garage.

36. Despite concluding that Ms. Robinson's vehicle was the one used in the shooting neither Defendant Corbin nor Defendant Mifsud sought to obtain a warrant for the search and/or seizure of the vehicle.

37. Defendants Corbin and Mifsud failed to seek a warrant because they knew they lacked sufficient probable cause for a judge to sign the warrant.

38. On the evening of September 4, 2023 – nearly 24 hours after the shooting – Defendants Waderlow and Arella saw Ms. Robinson's vehicle in her driveway.

39. By this time Defendants Corbin and Mifsud already had the name and photograph of the suspect in the shooting – the suspect had no relationship to Ms. Robinson.

40. Ms. Robinson was sitting in her car with her minor son to utilize the air conditioning.

41. Defendants Waderlow and Arella observed Ms. Robinson's vehicle sitting in her driveway.

42. After some time watching Ms. Robinson's vehicle, Defendants Waderlow and Arella saw her backing it into her garage and initiated a "traffic stop" – pulling up to Ms. Robinson in a semi-marked police vehicle without lights.

43. As they pulled up, Defendant Waderlow told other officers in the area to "all units make this address, vehicle's backing into the garage.".

44. Before his vehicle stopped in front of Ms. Robinson's driveway, Defendant Waderlow had his pistol drawn.

45. He immediately exited his vehicle and pointed his gun at Ms. Robinson and her two-year-old son.



46. When he did this, Defendant Waderlow was aware that a suspect had been identified who did not match the description of either Ms. Robinson or her child.

47. However, Defendants Waderlow and Arella did see that both of Ms. Robinson's fog lights were properly working.



48.One of the fog lights on the vehicle that was involved in the shooting was not

working.



49.Officers Waderlow, Rabior, and Arella pulled up to Ms. Robinson's house and

detained her and her child and began searching her car.

9

50. Defendants Waderlow and Arella had no reason to suspect that Ms. Robinson was involved in the shooting other than the information provided by Defendants Corbin and/or Mifsud.

51. Moreover, Defendants Waderlow and Arella were well aware of the propensity of the Ninth Precinct to botch investigations as demonstrated in an exchange between the two:

   a. Defendant Waderlow, "Number nine do another half investigation?"

   b. Defendant Arella, "Yeah, it tends to happen."

52. When Defendants Waderlow and Arella seized Ms. Robinson, the back half of her vehicle – the part with a license plate – was already in her garage.

53. Defendants Waderlow and Arella did not know that Ms. Robinson's license plate matched the one identified by the LPR until they entered her enclosed garage and looked at it.

54. "That's it." Defendant Waderlow upon looking at Ms. Robinson's license while standing approximately in the middle of her garage.

55. After the stop was initiated, nearly a dozen DPD officers arrived at Ms. Robinson's house in at least four marked police vehicles with their lights on.

56. Defendant Mifsud also appeared on the scene.

57. Upon information and belief, Defendant Mifsud was the ranking officer at Ms. Robinson's home.

10

58. Defendant Mifsud was aware of all the "evidence" linking Ms. Robinson's vehicle to the shooting.

59. Ms. Robinson was handcuffed while officers searched her car and home.

60. Ms. Robinson's minor son – who is non-verbal – was placed in the back of a police car while police conducted their searches.

61. Defendants found no evidence linking Ms. Robinson or her vehicle to the shooting.

62. There was no evidence linking Ms. Robinson or her car to the shooting because there was no link.

63. Despite this, Defendant Arella can be overheard brainstorming justifications to arrest Ms. Robinson.

64. To his credit, Defendant Waderlow explains that there is no basis for an arrest but states that it is above his pay grade and he does not care.

65. After a large group of heavily armed DPD officers searched Ms. Robinson's car and house, Defendant Mifsud released her and her child.

66. Defendant Mifsud then ordered and/or oversaw the impounding of Ms. Robinson's car with her purse, wallet, and phone still inside.

67. Despite having reviewed the evidence himself, Defendant Mifsud failed to check whether one of the fog lights was out on Ms. Robinson's vehicle to match it to the vehicle used in the shooting.

68. The seizure of Ms. Robinson, her child, and her property was predicated on the model and color of her car.

69. After Ms. Robinson's vehicle was seized, it was not examined for fingerprints, gunshot residue, or any other evidence that could have linked it to the shooting.

70. One of the DPD officers informed Ms. Robinson that they were part of the "gang squad" out of the Ninth Precinct.

71. The "gang squad" is the unofficial name for the Ninth Precinct's Special Operations Unit.

72. Defendants lacked probable cause to seize Ms. Robinson, her child, and/or her property.

73. Defendants Mifsud and Corbin lacked probable cause to direct other DPD officers to seize Ms. Robinson, her child, and/or her property.

74. Ms. Robinson's vehicle was not caught on cameras at the scene of the shooting because it was not there.

75. Ms. Robinson suffered extreme humiliation, embarrassment, and fear due to Defendants' unconstitutional and outrageous conduct.

76. During the incident, Ms. Robinson's neighbors watched as an army of DPD officers descended upon her house as though she were a dangerous criminal.

77. DPD officers repeatedly thought that their suspect was among the bystanders watching the scene – he was not.

78. It appears that at least one of Ms. Robinson's neighbors was confronted by the police based on this assumption.

79. Upon information and belief, DPD officers believed that the suspect was in the assembled neighbors because it was dark outside and many of Ms. Robinson's neighbors were Black.[4]

80. Ms. Robinson had a gun pointed at her and her child and then was separated from her child, handcuffed, and denied the ability to contact her family to have someone familiar care for her son.

81. Seized along with Ms. Robinson's car were her:

    a. Driver's license;

    b. Credit card;

    c. Employee I.D. badge for her work;

    d. Purse;

    e. Lawfully owned, registered, and possessed pistol;

    f. Car seat for her son; and

    g. Other personal items.

---

[4] The suspect in the shooting was also Black.

82. Many of these items had no evidentiary value for the investigation into the shooting.

83. Ms. Robinson was forced to replace many of these items such as her license, credit cards, car seat, and employee I.D. badge.

84. Ms. Robinson's vehicle was returned to her on September 27, 2023, after she paid the $272.72 impound fee.

### Defendant City of Detroit

85. Defendant City of Detroit employs, trains, and promulgates policies and procedures for its police officers, including the other Defendants in this case.

86. Defendant City of Detroit was aware that the FLOCK system would be used to investigate criminal activity including auto theft and violent crimes.

87. Defendant City of Detroit knows the location and coverage of the FLOCK system.

88. Defendant City of Detroit knows that certain vehicle models are commonly driven within its borders.

89. Defendant City of Detroit knew, or should have known, that there was a significant likelihood that the FLOCK system would be improperly used.

90. In September of 2023, Detroit Police Chief James White spoke at a Detroit City Council meeting in support of the FLOCK system, specifically

addressing concerns of abuse and misuse while promoting an expansion of the system.

91. In May of 2023, there was a meeting of the Detroit City Council where concerns of abuse and misuse of the FLOCK system were raised.

92. Despite this knowledge, Defendant City of Detroit failed to ensure that its officers and detectives adequate training concerning proper investigatory methods including the use of the FLOCK system in establishing probable cause for a search or seizure.

93. Defendant City of Detroit's inadequate training program for its detectives is evidenced by the egregious failures in this case including:

   a. The seizure of Ms. Robinson and her vehicle;

   b. Defendant Corbin's admission that he never received any training concerning the gunshot powder residue testing;

   c. Defendant Corbin's admission that he never checked to see if a fog light was out on Ms. Robinson's vehicle despite a fog light being out on the vehicle used in the shooting;

   d. The failure of Defendant Corbin to save, or otherwise capture, the data from the FLOCK system that identified Ms. Robinson's vehicle at Morang and Kelly;

e.  The failure of Defendant Corbin to conduct any real investigation into Ms. Robinson's vehicle;

f.  The destruction of physical evidence in Ms. Robinson's vehicle by police officers – under the supervision of Defendant Mifsud – as alleged by Defendant Corbin;

g.  The failure of Defendants Corbin and/or Mifsud to seek a warrant based on probable cause for the search and/or seizure of Ms. Robinson's vehicle.

94. As a result of Defendant City of Detroit's failure to train its employees, Defendants Mifsud and Corbin concluded that Ms. Robinson's vehicle was the one used in the shooting without adequate evidence to support probable cause and further caused officers to seize Ms. Robinson, her child, and her property.

## COUNT I: 42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Seizure

95. Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

96. The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

97. Defendants lacked probable cause to seize Ms. Robinson, her child, or her property.

16

98. Defendants Mifsud and/or Corbin caused officers to seize Ms. Robinson, her child, and her vehicle by informing them that the vehicle was involved in the shooting on September 3, 2023.

99. Defendants Mifsud and/or Corbin failed to inform those officers that they lacked sufficient evidence to justify a seizure of Ms. Robinson, her child, or her property.

100. Defendants Mifsud and Corbin chose not to get a warrant, despite having sufficient time to do so, because they knew they lacked probable cause.

101. The seizure of Ms. Robinson, her child, and her vehicle were a direct result of Defendant City of Detroit's policy of inadequately training its police officers and detectives.

102. Defendant Waderlow applied excessive force when he pointed his gun at Plaintiff Robinson and her minor child because:

    a. He lacked probable cause to seize Ms. Robinson;

    b. He lacked justification to apply *any* force to Ms. Robinson; and

    c. Ms. Robinson had not presented any threat or resisted in any way.

103. Moreover, Defendants Waderlow and Arella were both aware of the Ninth Precinct's record of botched investigations.

104. Defendants Waderlow and Arella also lacked the warrant necessary to enter Ms. Robinson's garage as it formed part of the curtilage of her home

rendering the entire fiasco violative of the Fourth Amendment even if there had been probable cause to seize Ms. Robinson's vehicle based on its license plate.

105.    As a result of Defendants conduct, Ms. Robinson suffered severe emotional injury and the economic harms described above.

## COUNT II: State Law – Negligence

106.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully restated herein.

107.    Defendants Mifsud and Corbin were grossly negligent with respect to the seizure of Ms. Robinson, her child, and her vehicle.

108.    Defendants Mifsud and Corbin ignored critical pieces of evidence that would have ruled out Ms. Robinson's vehicle from use in the shooting by failing to check the fog light on her vehicle.

109.    Defendants Mifsud and Corbin grossly exaggerated the strength and relevance of the image from the FLOCK system of Ms. Robinson's vehicle.

110.    Defendants Mifsud and Corbin ignored the clear limitations of the FLOCK system when relying on it to cause Ms. Robinson's car to be seized including the inability of the DPD to track the vehicle used in the shooting *after* the shooting.

111.    Defendants Mifsud and Corbin assumed that Ms. Robinson's vehicle was not home the night of September 3, 2023, despite there being a garage in which the vehicle was located.

112.    Defendants Mifsud and Corbin knew that their evidence was, at best, incredibly weak, and therefore chose not to seek a warrant.

113.    Given the absence of evidence tying Ms. Robinson's vehicle to the shooting – a reasonable officer would have conducted additional inquiry before causing the seizure of a person or property.

114.    Defendants Waderlow and Arella knew that Ms. Robinson was not a suspect, that they could not enter the curtilage of her home without a warrant, that they lacked probable cause to seize Ms. Robinson, and that the Ninth Precinct had a habit of botching investigation.

115.    Despite this knowledge Defendant Waderlow pointed his gun at Ms. Robinson and he and Defendant Arella seized her and her child.

116.    As a result of Defendants' gross negligence, Ms. Robinson suffered the significant financial, mental, and emotional injuries discussed above.

WHEREFORE, Plaintiff Isoke Robinson respectfully requests that this Court adjudge and declare that Defendants violated her rights in the manner set forth above and award her:

1. Nominal, compensatory, punitive, and exemplary damages;

19

2.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

3.  Any other relief this Court deems just and proper.

Plaintiff hereby requests a trial by jury.

Respectfully submitted,

*/s/ Paul Matouka*
Paul Matouka (P84874)
Oliver Bell Group
Attorneys for Plaintiff
50 W. Big Beaver Rd.
Suite 200
Troy, MI 48084
notifications@oliverlawgroup.com

Dated: November 8, 2024.